# EXHIBIT A

| | |
|---|---|
| **Federal Register**<br>Vol. 85, No. 56<br>Monday, March 23, 2020 | **Presidential Documents** |
| **Title 3—**<br><br>**The President** | Executive Order 13909 of March 18, 2020<br><br>**Prioritizing and Allocating Health and Medical Resources to Respond to the Spread of COVID–19** |

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the Defense Production Act of 1950, as amended (50 U.S.C. 4501 *et seq.*) (the ''Act''), and section 301 of title 3, United States Code, it is hereby ordered as follows:

**Section 1**. *Policy and Findings.* On March 13, 2020, I declared a national emergency recognizing the threat that the novel (new) coronavirus known as SARS–CoV–2 poses to our national security. In recognizing the public health risk, I noted that on March 11, 2020, the World Health Organization announced that the outbreak of COVID–19 (the disease caused by SARS–CoV–2) can be characterized as a pandemic. I also noted that while the Federal Government, along with State and local governments, have taken preventive and proactive measures to slow the spread of the virus and to treat those affected, the spread of COVID–19 within our Nation's communities threatens to strain our Nation's healthcare system. To ensure that our healthcare system is able to surge capacity and capability to respond to the spread of COVID–19, it is critical that all health and medical resources needed to respond to the spread of COVID–19 are properly distributed to the Nation's healthcare system and others that need them most at this time.

Accordingly, I find that health and medical resources needed to respond to the spread of COVID–19, including personal protective equipment and ventilators, meet the criteria specified in section 101(b) of the Act (50 U.S.C. 4511(b)). Under the delegation of authority provided in this order, the Secretary of Health and Human Services may identify additional specific health and medical resources that meet the criteria of section 101(b).

**Sec. 2**. *Priorities and Allocation of Medical Resources.*

(a) Notwithstanding Executive Order 13603 of March 16, 2012 (National Defense Resource Preparedness), the authority of the President conferred by section 101 of the Act to require performance of contracts or orders (other than contracts of employment) to promote the national defense over performance of any other contracts or orders, to allocate materials, services, and facilities as deemed necessary or appropriate to promote the national defense, and to implement the Act in subchapter III of chapter 55 of title 50, United States Code, is delegated to the Secretary of Health and Human Services with respect to all health and medical resources needed to respond to the spread of COVID–19 within the United States.

(b) The Secretary of Health and Human Services may use the authority under section 101 of the Act to determine, in consultation with the Secretary of Commerce and the heads of other executive departments and agencies as appropriate, the proper nationwide priorities and allocation of all health and medical resources, including controlling the distribution of such materials (including applicable services) in the civilian market, for responding to the spread of COVID–19 within the United States.

(c) The Secretary of Health and Human Services shall issue such orders and adopt and revise appropriate rules and regulations as may be necessary to implement this order.

**Sec. 3**. *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*March 18, 2020.*

[FR Doc. 2020–06161
Filed 3–20–20; 8:45 am]
Billing code 3295–F0–P

# EXHIBIT B

Billing Code:

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

**Notice of Designation of Scarce Materials or Threatened Materials Subject to COVID-19 Hoarding Prevention Measures Under Executive Order 13910 and Section 102 of the Defense Production Act of 1950**

**AGENCY:** Department of Health and Human Services (HHS).

**ACTION:** Notice.

**SUMMARY:** The Department of Health and Human Services (HHS) announces the issuance of a Notice under Executive Order 13910 (Executive Order) and section 102 of the Defense Production Act of 1950 (the Act), 50 U.S.C. 4512, as amended, designating health and medical resources necessary to respond to the spread of Coronavirus Disease 2019 (COVID-19) that are scarce or the supply of which would be threatened by excessive accumulation.  These designated materials are subject to the hoarding prevention measures authorized under the Executive Order and the Act.  The Notice was issued on March 25, 2020.

**DATES:**  This action took effect March 25, 2020.

**FOR FURTHER INFORMATION CONTACT:** Bryan Shuy: 202-703-8610; Bryan.Shuy@hhs.gov

**SUPPLEMENTARY INFORMATION:**

On March 23, 2020, and in response to the spread of COVID-19, President Trump signed Executive Order 13910 (Executive Order) to prevent hoarding of health and medical resources necessary to respond to the spread of COVID-19 within the United States.  As provided in the Executive Order, it is the policy of the United States that health and medical resources needed to respond to the spread of COVID-19, such as personal protective equipment and sanitizing and

disinfecting products, are appropriately distributed. This policy furthers the goal of protecting the Nation's healthcare systems from undue strain.

Through the Executive Order, the President delegated, to the Secretary of Health and Human Services (the Secretary), his authority under section 102 of the Defense Production Act of 1950, 50 U.S.C. 4512, as amended (the Act), to prevent hoarding of health and medical resources necessary to respond to the spread of COVID-19 within the United States, and his authority to implement the Act in subsection III of chapter 55 of title 50, United States Code (50 U.S.C. 4554, 4555, 4556, and 4660). Under this delegation and the Act, the Secretary may designate such resources as scarce materials or materials the supply of which would be threatened by such accumulation (threatened materials). The Secretary may also prescribe conditions with respect to accumulation of such materials in excess of the reasonable demands of business, personal, or home consumption. The Act prohibits any person from accumulating designated materials (1) in excess of the reasonable demands of business, personal, or home consumption, or (2) for the purpose of resale at prices in excess of prevailing market prices.

HHS is issuing this Notice designating scarce materials or threatened materials that are subject to the hoarding prevention measures authorized under the Executive Order and the Act. Under 50 U.S.C. § 4552(13), the term "materials" includes "(A) any raw materials (including minerals, metals, and advanced processed materials), commodities, articles, components (including critical components), products, and items of supply; and (B) any technical information or services ancillary to the use of any such materials, commodities, articles, components, products, or items." For purposes of this Notice, the term "scarce materials or threatened materials" means health or medical resources, or any of their essential components, determined by the Secretary to be needed to respond to the spread of COVID-19 and which are, or are likely

to be, in short supply or the supply of which would be threatened by hoarding. Designated scarce materials or threatened materials are subject to periodic review by the Secretary.

This designation is not a "regulation" under the Act. *See* 50 U.S.C. 4559. To the extent that it were, the Secretary finds that, in light of the current global pandemic, urgent and compelling circumstances make compliance with public comment requirements impracticable. *See id.* This designation shall terminate after 120 days from the date of publication, unless superseded by a subsequent notice.

A copy of the Notice is provided below and also can be found on HHS's website.

## NOTICE OF DESIGNATION OF

## SCARCE MATERIALS OR THREATENED MATERIALS

*Health or medical resources, or any of their essential components, determined by the Secretary of HHS to be needed to respond to the spread of COVID-19 and which are, or are likely to be, in short supply (scarce materials) or the supply of which would be threatened by hoarding (threatened materials). Designated scarce materials or threatened materials are subject to periodic review by the Secretary.*

The following materials are designated pursuant to section 102 of the Defense Production Act (50 U.S.C. § 4512) and Executive Order 13190 of March 23, 2020 (Preventing Hoarding of Health and Medical Resources to Respond to the Spread of COVID-19) as scarce materials or threatened materials:

1. N-95 Filtering Facepiece Respirators, including devices that are disposable half-face-piece non-powered air-purifying particulate respirators intended for use to cover the nose and mouth of the wearer to help reduce wearer exposure to pathogenic biological airborne particulates

2. Other Filtering Facepiece Respirators (e.g., those designated as N99, N100, R95, R99, R100, or P95, P99, P100), including single-use, disposable half-mask respiratory

protective devices that cover the user's airway (nose and mouth) and offer protection from particulate materials at an N95 filtration efficiency level per 42 CFR 84.181

3. Elastomeric, air-purifying respirators and appropriate particulate filters/cartridges

4. Powered Air Purifying Respirator (PAPR)

5. Portable Ventilators, including portable devices intended to mechanically control or assist patient breathing by delivering a predetermined percentage of oxygen in the breathing gas

6. Drug product with active ingredient chloroquine phosphate or hydroxychloroquine HCl

7. Sterilization services for any device as defined in section 201(h) of the Federal Food, Drug, and Cosmetic Act and sterilizers as defined in 21 CFR 880.6860, 880.6870, and 880.6880, including devices that already have FDA marketing authorization and those that do not have FDA marketing authorization but are intended for the same uses

8. Disinfecting devices intended to kill pathogens and other kinds of microorganisms by chemical means or physical means, including those defined in 21 CFR 876.1500, 880.6992, and 892.1570 and other sanitizing and disinfecting products suitable for use in a clinical setting

9. Medical gowns or apparel, e.g., surgical gowns or isolation gowns

10. Personal protective equipment (PPE) coveralls, e.g., Tyvek Suits

11. PPE face masks, including any masks that cover the user's nose and mouth and may or may not meet fluid barrier or filtration efficiency levels

12. PPE surgical masks, including masks that covers the user's nose and mouth and provides a physical barrier to fluids and particulate materials

13. PPE face shields, including those defined at 21 CFR 878.4040 and those intended for the same purpose

14. PPE gloves or surgical gloves, including those defined at 21 CFR 880.6250 (exam gloves) and 878.4460 (surgical gloves) and such gloves intended for the same purposes

15. Ventilators, anesthesia gas machines modified for use as ventilators, and positive pressure breathing devices modified for use as ventilators (collectively referred to as "ventilators"), ventilator tubing connectors, and ventilator accessories as those terms are described in FDA's March 2020 Enforcement Policy for Ventilators and Accessories and Other Respiratory Devices During the Coronavirus Disease 2019 (COVID-19) Public Health Emergency located at https://www.fda.gov/media/136318/download

**Authority**

The authority for this Notice is Executive Order 13910 and section 102 of the Defense Production Act of 1950, 50 U.S.C. 4512, as amended.

# EXHIBIT C



Hon. Jessica Allen  
U.S. Magistrate Judge  
U.S. Courthouse  
50 Walnut Street  
Newark, N.J. 07101

March 9, 2022

Re: U.S. v. TSC Agency

Dear Judge Allen:

    I am writing to you in advance of the sentencing of my company, TSC Agency, to give you some background on the company and explain to you how I, as the owner of the company, made the mistake of violating the Defense Production Act by selling a quantity of PPE face masks at a price above the prevailing market price. In doing so, I do not intend to excuse my mistake, but rather to put it into context of what was happening at the very beginning of the pandemic, when the entire business world in which I operated, was turned upside down.

General Overview of TSC Agency LLC.

    TSC Agency ("TSC") is a logistics and consulting company that began operations at the end of 2016, working primarily with smaller and mid-size companies that did not have an understanding of the intricacies of the supply chain and how it worked. My vision for the company was to use it to teach clients how to import goods properly, at an attractive price point. TSC helps clients understand the supply chain, the terms of shipping, the time frames involved, and educates them from the ground up. In addition, TSC has a logistics/operations side that can handle all of the logistics needed to bring goods into the United States. Some of our clients rely on TSC only for its consulting services, i.e., to help them understand how to get goods into the country, or to handle only the final arrangements once the goods arrive in the United States, while others hire TSC to arrange and handle the entire shipment for them from start to finish so that they do not have to deal with complications involved.

2020 - A Crash Landing for The World!

    January 2020 began as an ordinary month for TSC, although we heard some chatter that a virus had emerged out of China causing havoc across Asia and other parts of the world. As the month progressed the news became more worrisome, and the shipping industry began to shut down. As a result, I started to think about how I would be able to keep my company afloat and provide an income for myself and my employees and their families.

    As COVID-19 began hitting the US hard, I sprang into action helping move PPE into the US from all over the world. Shipping logistics was TSC's strength, and I was determined to help anyone who came asking for assistance. By the beginning of March, my phones were ringing off the hook! I cannot even estimate how many desperate calls I got from clients anxious to get their goods into the country. What I do know is that March was so chaotic I was getting between two and four hours of sleep a night, if I was lucky. I was answering calls and responding to text messages and emails at all hours of the day and night. Every hour of every day from then on



was pure exhaustion, however, the mission of saving lives was indeed top priority for me. It was during this hectic and chaotic period that I was approached about investing in a deal to buy and import PPE from China, something I had never done before, and without giving it enough thought, I agreed to participate in the deal.

      The transaction was first proposed to me around March 11. At the time, I knew nothing about the PPE industry or market, and I had no time to do any research, as I would normally have done. Instead, knowing that there was a tremendous need for PPE in the country, I jumped in blindly, hoping that the profits from the deal would help stabilize the company's finances. While this deal was well out of my comfort zone, and unlike any deal the company had done before, I decided to go ahead anyway because I thought that if the company's primary business collapsed, this deal would allow it to survive for several months. It was a dumb mistake and frankly a bad business decision. Had I waited just one short week, I would have come to realize that the services provided by TSC were needed more than ever. The unnecessary risk I took by entering into the PPE deal should have been left at the negotiation table.

Your Honor, I humbly apologize for my actions. I realize that my conduct, even though done with no bad intentions, was wrong and I am deeply remorseful. I should have investigated what the prevailing price was for PPE and made sure that I did not sell it at a higher price. My failure to do so was wrong and certainly does not represent who I am as a person or how my company normally does business. This experience has taught me more than any business degree or 4-year college ever will. In light of all that occurred during the onslaught of COVID-19, I recognize that I did not live up to my usual high standards of comportment. I sincerely regret and am embarrassed by the actions I took in selling 100,000 KN95 masks at a higher price than I should have. While I could try to excuse my actions, I made a poor decision during a very stressful time and amid growing business pressures. Still the responsibility is mine to carry.

Community & Charity:
      My mistake in this case does not reflect my true personality or the way I do business. To the contrary, I am a kind and generous person who has given back to the community during these trying times. I am part of a community that was hit particularly hard at the very beginning of the pandemic. The funeral notices that came through on a daily basis included those of close and distant family members and were truly heartbreaking. I made an extra effort to offer the little time I had to assist in burials at the local cemetery. All I could do was try to help in any way possible, while also actively working to bring in numerous shipments of medical supplies as fast as I was able.
Word reached me from friends, family, and charity organizations, concerning the financial burdens that were taking place in my community. I firmly believe that helping those in need is my duty as a community member. I am proud to say that during the pandemic, I was fortunate to be able to donate thousands of dollars to the needy in my community in documented transactions, and thousands in QuickPay to friends and or family in need of money to put food on their tables, clothing on their children and to assist in getting them through the financial crisis they were going through.
I am also proud to say that I began the "Beller 2020 Children Trust Fund" with an allotment of $100,000 to be given to charity over a 20-year period of time. Although this amount is not limited



to 100k, it's an important message to my family and children that being financially stable is a Gift from God, and there always has to be an element of giving to others before taking for themselves. This was the message passed down from my grandfather, a Holocaust Survivor who immigrated from Europe after the persecution of Nazi Germany. All his life he worked hard, and shared what he had with the less fortunate. This is his legacy to his children and grandchildren. - *"One must give charity and help sustain the lives of others even when one is not as comfortable as he/she would like to be."*

Throughout the pandemic, I was very involved with my community, clients and others, in helping in the movement of PPE, and even finding compassionate donors to supply PPE to our GREAT Nurses who were allotted minimal PPE per week. I stopped everything, and did the best I could for them whenever the calls came through. TSC also was a big facilitator of logistics (through one of my clients) to assist in movement of PPE to the NYS Public School System, to enable then to reopen the schools in 2021.

TSC's Current Financial Condition
It is no secret that the most talked about issue today is the massive supply chain bottle neck. The exorbitant cost of freight being charged by the carriers is causing many companies to short ship, not ship at all, and or close down. The supply chain problems have created cash flow problems for TSC, which only gets paid after the goods are delivered. I have taken a great deal of the profits and reinvested them back into the company to service our customers. I have many outstanding bills domestically and internationally which, we are thank G-d able to pay slowly, as money trickles in. If our clients continue to pay for our services, we will survive the pandemic related supply chain problems. Unfortunately, over the past year, payments have been slow, as our clients too have been impacted by the supply chain problems. Given the cash flow problems we are experiencing, I humbly ask that the Court permit TSC to pay any fine imposed over a period of 12-24 months.

Respectfully and sincerely,

Benjamin Beller

Tri-State Consulting Agency     www.tscagency.com     info@tscagency.com